## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SHAWN KEELEY,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No.  01 - 0725  (JDB)** |
| **LAWRENCE M. SMALL, Secretary, Smithsonian Institution,** | |
| **Defendant.** | |

### MEMORANDUM OPINION

Presently before the court in this employment discrimination case brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981, is the motion of defendant Lawrence M. Small, Secretary of the Smithsonian Institution, for summary judgment.  Plaintiff has brought claims against defendant for retaliation and a retaliation-based hostile work environment.  For the reasons stated below, the Court will grant defendant's motion for summary judgment.

### BACKGROUND

Plaintiff is an employee of the Smithsonian Institution ("Smithsonian") and, at all times relevant to the facts and disputes at issue in this case, served as a financial manager with responsibility for all of its museum shops.  In May 1997, plaintiff filed his first action against the Smithsonian in this Court, alleging that he suffered retaliation in violation of Title VII based on the testimony he had provided in another employment discrimination action in 1995.  See Defendant's Second Statement of Material Facts Not in Genuine Dispute ("Def. Statement") ¶ 1;

-1-

Keeley v. Smithsonian Inst., Civil Action No. 97-1076 (D.D.C.).  A jury verdict in plaintiff's favor was returned in that case in March 1999, and an amended judgment on the verdict awarding plaintiff compensatory damages, back pay, three merit salary increases, costs, and attorney's fees was filed in May 1999.  See Def. Statement ¶ 2.  The Smithsonian fully complied with the amended judgment after it voluntarily withdrew its notice of appeal in October 1999.  Id. ¶ 3.  As part of the relief awarded by the Court, plaintiff was given a merit salary increase for his performance evaluation in 1998.  Id. ¶ 4.  Shortly after the conclusion of the litigation, plaintiff alleges he was told that the "official word" at the Smithsonian is that plaintiff was successful in the litigation because of the racial make-up of the jury.  See Second Am. Compl. ¶ 15. Following that, according to plaintiff, he suffered a series of adverse employment actions including:  no merit salary increases following successful performance reviews, denial of several promotions, and a loss of responsibilities in the budget process and accounting.

## I.       Performance Reviews

Shortly after the conclusion of his prior litigation against the Smithsonian on November 29, 1999, plaintiff submitted his "self-appraisal" review for fiscal year 1999.  Def. Statment ¶ 12. Subsequently, plaintiff received his performance review with a rating of "highly successful" for fiscal year 1999.  Id. ¶¶ 12-13.  After that review, plaintiff's supervisor, Joseph Carper, did not give plaintiff a merit salary increase.  Id. ¶ 17.  A salary increase was not automatic after a rating of "highly successful," as Mr. Carper had discretion to determine any salary increase.  Id. ¶¶ 17-18.  Moreover, Mr. Carper did not give a salary increase to any of his subordinates.  Id.

Plaintiff experienced similar incidents at the next two fiscal year reviews.  For fiscal year 2000, he never received a review from his new supervisor, Paul Wessel.  Id. ¶ 20.  However, Mr.

Wessell did not provide fiscal year 2000 performance reviews for any of his subordinates.  <u>Id</u>.

Plaintiff did not receive a merit salary step increase for fiscal year 2000, nor did any other

employee supervised by Mr. Wessel.  <u>Id</u>. ¶ 23.  For fiscal year 2001, plaintiff did receive a

performance review on or about February 7, 2002.  <u>Id</u>. ¶ 68.  However, this time instead of a

rating of "highly successful" plaintiff received a "fully successful" rating.  <u>Id</u>.  Plaintiff's 2001

evaluation was issued by Gary Mercer, the new Chief Operating Officer of Retail Operations at

SBV, who began working at SBV on January 20, 2001.  <u>Id</u>. ¶¶ 71-72.  Mr. Mercer gave four of

the six employees he directly supervised a performance evaluation of "fully successful."  <u>Id</u>. ¶ 73.

The Smithsonian provided a one-time bonus to employees based on their fiscal year 2001 ratings.

A rating of "fully successful" merited a 3.5% of salary bonus, while "highly successful" garnered

4.5%.  <u>Id</u>. ¶ 69.

## II.    Promotions

In November 1999, the same month his earlier litigation ended, plaintiff alleges that he

was shown a proposed reorganization chart by Ronald Banscher.  Def. Statement ¶ 65.

According to plaintiff, Mr. Banscher indicated that the chart showed plaintiff's position being

terminated, and Mr. Banscher encouraged plaintiff to consider another position.  <u>Id</u>.  In February

2000, the CEO of Smithsonian Business Ventures ("SBV"), Gary Beer, initiated the actual

reorganization of SBV for business purposes.  <u>Id</u>. ¶ 25.  As part of that reorganization, plaintiff

was required to report "pro tem" to Mr. Wessell.  <u>Id</u>. ¶ 24.  Throughout the reorganization,

plaintiff continued to work as the Financial Manager of Museum Stores.  <u>Id</u>. ¶¶ 24-25.

Plaintiff complains about the promotion, on June 18, 2000, of Robert Schelin, the SBV

Transition Manager and supervisor of plaintiff, who was named the Special Projects and Deputy

Financial Officer for all of SBV.  See Id. ¶ 120.  This position was "secretary designated" and therefore not open for competition.  Id. ¶ 122.  However, plaintiff contends that in August 1999 he learned of the possibility that a "corporate controller" position would be created.  Pl. Statement ¶ 145.  He contends that he expressed interest in the position to Mr. Banscher, Mr. Beer and Mr. Wessel.  Id. ¶¶ 146-147.  Mr. Wessel, according to plaintiff, said he would let plaintiff know when the position was available.  Id. ¶ 147.  Plaintiff believes that Mr. Schelin's promotion to Special Projects and Deputy Financial Officer was the same "corporate controller" position in which he was interested.  Id. ¶ 148.

Plaintiff next claims he was unfairly denied a promotion to "administratively exempt" ("AE") status.  Prior to January 2002, SBV's compensation system was divided into two designations, "AE" and "institution schedule" ("IS").  Def. Statement ¶ 28.  Those employees who were classified as "AE" did not receive an automatic annual cost of living increases, and did not qualify for merit salary step increase.  Id. ¶ 32.  An employee designated as "IS," on the other hand, was paid according to a salary schedule.  Pl. Statement ¶ 27d-2.  Sometime after March 1999, SBV began converting "IS" employees to "AE."  Def. Statement ¶ 27.  An SBV employee became designated "AE" when he was hired, promoted, or reassigned to a different position.  Id. Until January 2002, if a SBV employee was not hired as an "AE" designee, unless he was later promoted or reassigned he would not be converted to "AE."  Id.  Effective January 12, 2002, SBV created a compensation system known as "paybanding" for all employees who were designated as "AE" or "IS" and not part of the collective bargaining agreement.  Id. ¶ 33.  After that point all "AE" designations were eliminated.   Plaintiff was never designated "AE" before the old system was discarded in favor of "paybanding."  Id. ¶36.

-4-

### III.    Responsibilities

Plaintiff also complains that he lost budgetary and accounting responsibility because of his previous discrimination claim against the Smithsonian.  Plaintiff asserts that he suffered reduced accounting responsibilities when a new accounting software was selected and implemented.  The new software selection process began in the spring of 2000, when a committee at SBV was formed to select the software.  Def. Statement ¶ 55.  Initially, plaintiff attended those meetings.  Id. ¶ 56.  Kathy King, who reported to plaintiff and was at that time a manager of the Sales Audit and Reports Division, also began to attend the committee meetings in May 2000.  Id.  After Ms. King began to attend the meetings, plaintiff stopped attending them. Id.  In the fall of 2000, SBV implemented the new accounting and financial software system known as Lawson.  Id. ¶ 47.   According to plaintiff, he went nine or ten months without having the software installed on his computer.  Pl. Statement ¶ 47d.

During the implementation of the Lawson software, plaintiff also consulted with Ms. King regarding the level of access each employee in the Museum stores would have to the new software.  Def. Statement ¶ 50.  The possible designations were "G/L Entry" for general ledger entry, "A/P" for accounts payable entry, and "Inquiry Only" access.  Id.  Ms. King sent to Mr. Schelin an e-mail, which she had compiled with plaintiff, that listed the level of access for each employee in the Museum Stores.  Id. ¶ 51.  Plaintiff was included on that e-mail.  Id.  As a result of being listed as "inquiry only" status, plaintiff did not receive training on the new Larson software.  Id. ¶ 52.

Plaintiff complains that he lost responsibilities in the budget process after the reorganization.  On or about January 20, 2001, SBV hired Mr. Mercer as the Chief Operating

Officer of Museum Retail Operations.  Def. Statement ¶ 37.  Mr. Mercer was responsible for all

business units within Museum Retail Operations, including ultimate responsibility for the

budgets of the various units.  Id. ¶ 37.  As part of his involvement in the budget process, Mr.

Mercer requested budget information from the heads of each department within the Museum

Stores.  Id. ¶ 39.  This meant Mr. Mercer received budget information from those on plaintiff's

staff and not directly from plaintiff.  Id.  In the spring of 2001, plaintiff complained to Mr.

Mercer that budget numbers were being directly submitted rather than going through plaintiff.

 Id. ¶ 40.

## IV.    Plaintiff's EEO Complaints

As a result of these actions, in late 1999 plaintiff contacted an EEO counselor and began

filing a series of three formal EEO complaints in or about December 1999, February 2000 and

June 2000.  Def. Statement ¶¶ 5-10.  Plaintiff's EEOC complaints made the following retaliation

claims that have also been raised in this action:  Mr. Banscher told plaintiff he was "sick of this

lawsuit bullsh--"; plaintiff received a late fiscal year 1999 performance review and did not

receive a merit salary increase; plaintiff's position was classified "pro tem"; in April 2000

plaintiff received a new position description; Ms. King took over some of plaintiff's accounting

responsibilities; and plaintiff received a threatening voice mail from Mr. Wessel.  Id. ¶¶ 5-9.

Plaintiff raised in his Second Amended Complaint the following claims that were not before the

EEOC:  denial of fiscal year 2000 performance review and salary increase; denial of promotion

to "AE"; removal from the budget process; denial of necessary accounting training; the

promotion of Mr. Schelin; and lower fiscal year 2001 rating that resulted in a reduced bonus.

Compare Second Am. Compl. ¶¶ 8-41 with Def. Mem., Exs. 4-6 (showing claims raised in

Second Amended Complaint that were not raised in the administrative process).

## LEGAL STANDARD

I.    **Summary Judgment**

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party may successfully support its motion by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. (quoting Fed.R.Civ.P. 56(c)).

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. Id. at 252. By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment. Celotex, 477 U.S. at 322. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted). Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." Id. at 252; see also

Holbrook v. Reno, 196 F.3d 255, 259-60 (D.C. Cir. 1999).

## II.     Legal Framework Under Title VII

A plaintiff has the burden of establishing a prima facie case of retaliation by a preponderance of the evidence.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).   To establish a prima facie claim of retaliation, a plaintiff must establish that (1) he engaged in a statutorily protected activity; (2) the employer took an adverse personnel action; and (3) a causal connection existed between the two.  Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999); Mitchell v. Baldridge, 759 F.2d 80, 86 (D.C. Cir. 1985); McKenna v. Weinberger, 729 F.2d 783, 790 (D.C. Cir. 1984).

If the plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.  McDonnell Douglas, 411 U.S. at 802.  The employer's burden, however, is merely one of production.  Burdine, 450 U.S. at 254-55.  The employer "need not persuade the court that it was actually motivated by the proffered reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."  Id.

If the employer is successful, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext for retaliation.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).  The plaintiff may attempt to establish pretext "by showing that the employer's proffered explanation is unworthy of credence."  Burdine, 450 U.S. at 256).  But "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination."  Reeves, 530 U.S. at 147.

-8-

Thus, the trier of fact may also "consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.'" Id. (quoting Burdine, 450 U.S. at 255 n.10). "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors . . . includ[ing] the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." Id. at 148-49.

Although the "intermediate evidentiary burdens shift back and forth" under the McDonnell-Douglas framework, "'[t]he ultimate burden of persuading the trier of fact that the defendant [retaliated] against the plaintiff remains at all times with the plaintiff.'" Reeves, 530 U.S. at 143 (quoting Burdine, 450 U.S. at 253). Once the defendant has proffered a legitimate non-discriminatory reason for its action, then, the question is whether that proffered reason is a pretext for retaliation, and at this point the McDonnell Douglas shifting burdens framework disappears, the sole remaining issue is retaliation vel non, and "to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a [retaliatory] reason." Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003); see Reeves, 530 U.S. at 142-43. Examination of that issue in this setting therefore requires consideration of all the relevant circumstances in evidence, including the strength of the prima facie case, any direct evidence of retaliation, any circumstantial evidence that defendant's proffered explanation is false (which may be enough with the prima facie case to infer retaliation), and any properly-considered evidence supporting the employer's case. Reeves, 530 U.S. at 147-48; see also Teneyck v. Omni Shoreham Hotel, 365 F.3d 1139,

1151 (D.C. Cir. 2004); <u>Lathram</u>, 336 F.3d at 1089; <u>Waterhouse</u>, 298 F.3d at 993; <u>Aka</u>, 156 F.3d at 1290.

**<u>ANALYSIS</u>**

Plaintiff's Second Amended Complaint asserts a wide ranging list of discrete retaliation claims plus a retaliation-based hostile work environment claim.  However, once each claim is assessed against the facts in the record, it is clear that plaintiff's claims cannot survive summary judgment.  First, many of plaintiff's claims were not timely exhausted and therefore cannot be pursued here.  Moreover, the record shows that for all of plaintiff's claims, he either cannot establish a prima facie case or fails to show that defendant's proffered explanation was a pretext for retaliation.

**I.       Exhaustion**

Defendant argues in its second motion for summary judgment that plaintiff has failed to timely exhaust his administrative remedies with respect to several of the claims in the Second Amended Complaint.  <u>See</u> Def. Mem. at 11-14.  Specifically, defendant contends that plaintiff has failed to exhaust the following claims: (1) denial of performance review for fiscal year 2000; (2) denial of salary increase for fiscal year 2000; (3) reclassification of plaintiff's position to "pro tem"; (4) denial of promotion to "AE" status; (5) removal from budget process; (6) denial of access to training for new accounting system; (7) failure to promote to "corporate controller" position; and (8) low fiscal year 2001 review resulting in reduced one-time bonus.  <u>See</u> Def. Mem. at 12.  Defendant's particular focus is on the last two claims which were raised for the first time in the Second Amended Complaint.  Plaintiff responds that even if these claims were not timely exhausted, this Court's September 26, 2003 Memorandum Opinion issued in this case

-10-

found that those claims did not have to be exhausted because "[i]t is well established that 'in circumstances where an initial complaint with an administrative agency alleges discrimination and acts of reprisal for previous grievances lodged against the department, it is unnecessary for an employee to refile a new complaint upon every new instance.'"  Sept. 26, 2003 Mem. Op at 6 (quoting Bonds v. Heyman, 950 F. Supp. 1202, 1208 (D.D.C. 1997)).  Plaintiff argues that "law of the case" dictates this Court should again deny defendant's exhaustion arguments as to these two claims.

A review of the Court's September 26, 2003 Memorandum Opinion leads the Court to conclude that its prior decision denying defendant's exhaustion motion failed to consider Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002), which had been recently decided.  That case calls into question the cases relied on in this Court's earlier decision, and over the past two years a consensus has developed in the courts on the need to exhaust all discrete discrimination and retaliation claims.

Generally, a Title VII plaintiff must exhaust his administrative remedies prior to filing an action in federal court.  See Morgan, 536 U.S. at 122.  This requirement also applies to federal employees, who must contact an EEO counselor within 45 days of the alleged personnel action. See 29 C.F.R. § 1614.105.  Prior to Morgan, many courts held that a plaintiff did not have to exhaust retaliation claims that arose after the filing of an initial administrative complaint.  See Nealon v. Stone, 958 F.2d 584, 590 (4th Cir. 1992); Kirkland v. Buffalo Bd. of Educ., 622 F.2d 1066, 1068 (2nd Cir. 1980); Sussman v. Tanoue, 39 F. Supp. 2d 13, 21 (D.D.C. 1999) ("most courts have concluded plaintiffs are not required to exhaust administrative remedies for claims of retaliation which arise following the filing of administrative complaints").  This Court's prior

-11-

opinion relied upon that same reasoning.  See Sept. 26, 2003 Mem. Op. at 6-8.

However, in the years since Morgan that reasoning has been undermined.  Morgan itself

rejected the "continuing violation" theory that would permit plaintiffs to recover for discrete acts

of discrimination and retaliation that were not exhausted but were "sufficiently related" to

exhausted claims.  536 U.S. at 105.  The decision also emphasized "strict adherence" to the

procedural requirements of Title VII.  Id. at 108.  Although the facts of Morgan dealt with

discrete incidents of discrimination and retaliation occurring prior to any administrative

exhaustion of claims, it has been understood to bar unexhausted claims arising after the filing of

an administrative action.  Martinex v. Potter, 347 F.3d 1208, 1210-11 (10th Cir. 2003); Romero-

Ostolaza v. Ridge, 370 F. Supp. 2d 139, 149 (D.D.C. 2005).  Moreover, since Morgan many of

the cases relied upon in this Court's earlier decision have been called into question.  In Bowie v.

Ashcroft, 283 F. Supp. 2d 25, 24 (D.D.C. 2004), for example, the court found the reasoning of

Bonds v. Heyman, 950 F. Supp. 1202, 1208 (D.D.C. 1997) (relied upon in the Sept. 26, 2003

Opinion), inapposite in light of Morgan.  See also Romero-Ostolaza, 370 F. Supp. 2d at 148

(noting that the analysis of Nealon, 958 F.2d at 590, and Malhotra v. Cotter & Co., 885 F.2d

1305, 1312 (7th Cir. 1989), both cited in the Court's earlier decision, is irrelevant after Morgan).

Thus, given Morgan's strict adherence to procedural requirements including exhaustion,

and the subsequent development of the law that casts doubt on the reliability of cases on which

this Court previously relied, the Court concludes that its earlier opinion is no longer sound.  In

order for plaintiff to pursue his claims in federal court, he must establish that he timely exhausted

his administrative remedies for each discrete claim of retaliation.  Plaintiff essentially concedes

that he has failed to timely exhaust those claims identified by defendant.  See Pl. Opp'n at 8-9.[1]

Therefore, because plaintiff failed to exhaust those claims, he may not pursue them here for the

first time.[2]  However, in light of the Court's earlier opinion, and the fact that the parties have fully

briefed the merits of all of plaintiff's claims, the Court will nonetheless consider the merits of all

plaintiff's claims, even those subject to dismissal for failure to exhaust.

## II.     Retaliation Claims

### A.     Prima Facie Case

To state a prima facie claim for retaliation, plaintiff must establish that he engaged in

protected activity and suffered an adverse employment action, and that there was a causal

connection between the two.  See Brody, 199 F.3d at 452.  Clearly, plaintiff engaged in

statutorily protected activity when he filed administrative complaints in December 1999,

February 2000, and June 2000.  Furthermore, plaintiff's prior Title VII litigation against the

Smithsonian ending in late 1999 constitutes protected activity.  However, for several of his

retaliation claims, plaintiff cannot show that he suffered an adverse employment action.

#### 1.     Adverse Employment Action

"To establish an adverse personnel action in the absence of diminution in pay or

benefits, plaintiff must show an action with 'materially adverse consequences affecting the terms,

---

[1]  Plaintiff contends that his complaint about Mr. Schelin's promotion was "implicitly" raised during his EEOC investigation, Pl. Opp'n at 9, but the record does not show such a claim was ever properly raised before the EEOC.

[2]  Plaintiff's exhausted (and thus viable) claims are:  (1) delay in fiscal year 1999 performance review; (2) no salary increase for fiscal year 1999; (3) interference with the EEOC investigation; (4) non-promotion to "financial analyst" position; (5) threatened job loss; (6) verbal complaints; and (7) supervisors' refusal to work with him.

conditions, or privileges of employment.'" Stewart v. Evans, 275 F.3d 1126, 1134 (D.C. Cir.

2002) (quoting Brody, 199 F.3d at 457 (decision of district court reprinted with endorsement

from D.C. Circuit panel)).  Indeed, "[a]n 'employment decision does not rise to the level of an

actionable adverse action . . . unless there is a tangible change in the duties or working conditions

constituting a material employment disadvantage.'" Id. (quoting Walker v. WMATA, 102 F.

Supp 2d 24, 29 (D.D.C. 2000)); see also Burlington Indus., Inc. v. Elllerth, 524 U.S. 742, 761

(1998) ("A tangible employment action constitutes a significant change in employment status,

such as hiring, firing, failing to promote, reassignment with significantly different

responsibilities, or a decision causing a significant change in benefits."); Brody, 199 F.3d at 457

(must show "objectively tangible harm").  Examining plaintiff's discrete retaliation claims, for

several he has not offered any evidence to show that he suffered an objectively tangible harm to

the terms of his employment.

a.      *Promotion Claims*

Plaintiff makes multiple claims of retaliation that relate in some form to what he calls a

non-promotion.  Two such claims are that plaintiff's position at SBV would be reclassified from

permanent to "pro tem" and that plaintiff was told that his position would be terminated.

However, for neither claim can plaintiff establish that he actually suffered an adverse

employment action.  Plaintiff appears to concede the point regarding his claim about his "pro

tem" status because he does not address defendant's arguments in his opposition.  In any event,

there is no evidence that his position was in fact reclassified as temporary, or that any such

reclassification, if it did occur, caused an objectively tangible harm to the terms of his

employment.  The same analysis applies to plaintiff's claim that he was threatened with

-14-

termination.  See Second Am. Coml. ¶ 38.  Although there is a dispute as to whether plaintiff

was actually told his position would be terminated, there is no dispute that plaintiff was in fact

not terminated.  Thus, he did not suffer an adverse employment action because he suffered no

objectively tangible harm to the terms or conditions of his employment.  On these two claims,

defendant is therefore entitled to summary judgment because plaintiff has not establish a prima

facie case.

> b.     *Performance Reviews*

Plaintiff makes multiple claims of retaliation relating to his performance reviews for

fiscal years 1999 through 2001.  For one such claim -- a three-month delay in receiving his fiscal

year 1999 performance review, see Second Am. Compl. ¶ 18 -- plaintiff does not establish that it

was an adverse employment action.  He did in fact receive the performance review, just three

months late, along with other employees at SBV.  See Def. Statement ¶ 13.  He has asserted no

tangible harm from the delay.  Plaintiff was rated "highly successful" and there is no evidence the

delay in the review, itself, constituted a harm to plaintiff's employment.  Absent evidence of

some distinct tangible harm to the terms or conditions of his employment, a highly successful

evaluation is not an adverse employment action.  See Russell v. Principi, 257 F.3d 815, 819

(D.C. Cir. 2001) ("In most circumstances performance evaluations alone at the satisfactory level

or above should not be considered adverse employment actions.").

> c.     *Comments from Supervisors*

Plaintiff makes three claims based on comments either relayed to plaintiff or made to him

directly, but all three of the alleged incidents fall well short of establishing an adverse

employment action.  The three individual statements are: a message conveyed to plaintiff shortly

after the conclusion of his prior litigation that the "official word" was that his success was based

on the racial makeup of the jury, Second Am. Compl. ¶ 15; after plaintiff filed his December

1999 administrative complaint, Mr. Banscher told him that he was "sick of this lawsuit bullsh--"

and demanded that plaintiff withdraw his complaint, id. ¶ 34; and on June 2, 2000, plaintiff

received a voice-mail from his supervisor, Mr. Wessel, stating that he was "going to conduct a

witch hunt."  Id. ¶ 37.

Comments directed at an employee, especially from a supervisor, can constitute an

adverse employment action.  See Patterson v. McLean Credit Union, 491 U.S. 164, 179-80

(1989) (noting that racial harassment could affect the "terms, condition, or privileges of

employment" under Title VII).  However, Title VII does not operate to police the level of civility

in the workplace.  See Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 80 (1998); Jones

v. Billington, 12 F. Supp. 2d 1,13 (D.D.C. 1997) (critical letter from supervisor not an adverse

action); Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir.1996) ("not everything that makes

an employee unhappy is an actionable adverse action").  The focus, then, is on whether the

comments are so severe as to affect the terms of employment and thereby constitute an adverse

action.  See Henry v. Guest Services, Inc., 902 F. Supp. 245, 252 (D.D.C. 1995).

For each of these alleged comments, plaintiff cannot establish that it is so severe as to

constitute, by itself, an adverse employment action.  With respect to the statement regarding the

"official word" about plaintiff's prior litigation, not only does plaintiff fail to provide evidence

about who told him this "official word," but he does not have any evidence about who the

"official word" came from.  Even if this evidence were available, the comment, by itself, does not

constitute an adverse employment action because it is not so severe as to affect the terms and

-16-

conditions of plaintiff's employment.  Similarly, the June 2000 voice-mail from Mr. Wessel,

when read in its full context, is merely a critical message directed at plaintiff and another SBV

employee about their availability in the budget process.  See Def. Mem., Ex. 47.  Such criticism

is part of the "ordinary tribulations of the workplace" for which Title VII does not provide a

remedy.  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).  Finally, while Mr.

Banscher's alleged comment that he was "sick of this lawsuit bullsh–" certainly is vulgar, and

even may show that plaintiff's protected activity was on the mind of his supervisors, the comment

itself is not actionable.  See Stewart, 275 F.3d at 1133 (Title VII does not "purge the workplace

of vulgarity") (quoting Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995)).  There

is no evidence that this comment hindered plaintiff's performance or had any effect on the terms

of his employment, or that any similar comments were ever again made to plaintiff.  See Childers

v. Slaters, 44 F. Supp. 2d 8, 19 (D.D.C. 1999), modified on reconsideration 197 F.R.D. 185

(D.D.C. 2000) ("[C]onduct that sporadically wounds or offends, but does not hinder an

employee's performance does not rise to the level of adverse action.").  Defendant has thus failed

to establish that these workplace comments constituted discrete retaliatory actions that satisfy the

prima facie case requirement of adverse employment actions.

### d.      Reduction in Responsibilities

According to plaintiff, because of his protected activity his position description was

changed, he lost responsibilities in the budget process, he was excluded from the accounting

systems and denied necessary training, subordinates took over his accounting responsibilities,

and his supervisors avoided dealing with him.  See Second Am. Compl. ¶¶ 26-31.  Generally, an

adverse employment action constitutes "a significant change in employment status, such as

hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Brody, 199 F.3d at 456.  On the other hand, "changes in assignments and work-related duties do not ordinarily constitute adverse employment actions if unaccompanied by a decrease in salary or work hour changes." Mungin v. Katten, Muchin & Davis, 116 F.3d 1549, 1557 (D.C. Cir. 1997).  To make a claim based on a reduction in responsibilities, a plaintiff must show that the change in duties resulted in a loss of pay, benefits or promotion possibilities, or resulted in a change in position that was not as "high profile." See Tasser v. Ramsey, 125 F. Supp. 2d 1, 5 (D.D.C. 2000) (reassignment to a "desk job" meant lost overtime potential and reduction in promotion potential).  "Mere inconvenience and alteration of job responsibilities will not rise to the level of adverse action." Childers, 44 F. Supp. 2d at 19.

Examining plaintiff's claims regarding changes in his responsibilities at SBV, it is apparent that he fails to show he suffered any material change in the terms of his employment from the alleged changes in responsibilities, and thus he cannot establish that he suffered an adverse employment action.  First, plaintiff claims that his position description was changed in 2000, taking away his responsibilities for "designing and developing of integrated financial management systems."  Pl. Opp'n at 30-31.  He also claims that he was forced to report to three supervisors rather than one. Id. at 31.  However, examining the evidence put forth by plaintiff reveals that his position description underwent minimal changes in 2000. See Pl. Opp'n, Ex. 20 (edits upon plaintiff's old position description).  More importantly, plaintiff does not make any allegation that he suffered tangible harm to his employment, and thus he cannot make out a prima facie case.  His claim that he was taken out of the budget process is equally unavailing.  Even

were the Court to credit all of plaintiff's evidence on this claim (much of which is based on hearsay or plaintiff's unsubstantiated allegations), it merely shows that in 2001 plaintiff's new supervisor, Mr. Mercer, became involved in the budget process.  Def. Statement ¶ 37.  According to plaintiff, as a result of Mr. Mercer's involvement, plaintiff had diminished responsibilities.  Even if this were the case, plaintiff has not shown how his reduced budgetary responsibilities (which appear to have occurred only in 2001) amounted to a tangible harm to his employment.

Plaintiff also makes a number of allegations regarding his involvement in the accounting systems at SBV.  He complains that he was usurped as "team leader" on the committee that selected new accounting software, was not given training on or access to the new software, and had subordinates take over his accounting responsibilities.  Second Am. Compl. ¶¶ 28-29.  Again, he is attempting to make a federal case out of what are otherwise the "ordinary tribulations of the workplace."  Faragher, 524 U.S. at 788.  Plaintiff's evidence on these claims consists almost exclusively of his own speculation, but the full record shows that most of plaintiff's allegations are unfounded.  No one testified that plaintiff was removed from the software selecting committee.  Moreover, Ms. King testified that plaintiff was designated "inquiry only" on the new software after a meeting between herself and plaintiff.  See Def. Mem. Ex. 24, Deposition of Kathy King ("King Dep.") at 50.  As a result of that designation, plaintiff was not given training on the software.  Id. at 51.  However, even if all of plaintiff's allegations were substantiated, he has not explained how these changes in his accounting responsibilities affected the terms of his employment, and for that reason he cannot establish a prima facie case.

Plaintiff next alleges that his supervisors ceased dealing directly with him and instead conferred with his subordinates on financial management matters.  Second Am. Compl. ¶ 30.

Defendant responds that the evidence shows only one occasion on which plaintiff's supervisors went to his subordinates, in December 2000 when Mr. Wessel e-mailed Ms. King.  See Def. Statement ¶ 58.  Defendant also notes that for instances when SBV employees who were not plaintiff's supervisors contacted Ms. King, plaintiff was always informed and made the ultimate decision.  Id. ¶ 59.  These few (possibly only one) incidents where some SBV employees avoided working with plaintiff, without more concrete impact on the material terms of plaintiff's employment, do not constitute adverse employment actions.  See Roberts v. Segal Co., 125 F. Supp. 2d 545, 549 (D.D.C. 2000) ("The fact that plaintiff believes she was getting the cold shoulder from her co-workers does not constitute a materially adverse consequence or disadvantage in the terms and conditions of her employment so as to establish an adverse personnel action.");  Strother v. S. Cal. Permanente Med. Group, 79 F.3d 859, 869 (9th Cir. 1996) ( "[M]ere ostracism in the workplace is not enough to show an adverse employment decision.").

e.    *EEOC Investigation*

Plaintiff's final category of allegations relates to defendant's alleged interference with his EEOC investigation.  Second Am. Compl. ¶ 41.1.  However, a federal employee may not bring a claim under Title VII for allegations concerning EEOC investigation procedures.  See Jordan v. Summers, 205 F.3d 337, 342 (7th Cir. 2000).  Some courts have found that claims about the EEOC process do not constitute adverse employment actions.  See, e.g., Lowell v. Brown, 2000 WL 521726, *7 (N.D. Ill. March 2, 2000) (dilatory processing of EEOC complaint does not constitute an adverse employment action).  But as a preliminary matter, there is no cause of action under Title VII for complaints of delay or interference in the investigative process.  See McCottrell v. E .E.O.C., 726 F.2d 350, 351 (7th Cir. 1983); Trout v. Lehman, 1983 WL 578, *1

(D.D.C. July 7, 1983) (a claim regarding interference with an EEOC investigation is not about a condition of employment and "therefore not cognizable as a separate cause of action in a judicial proceeding brought under Title VII").  Plaintiff's sole remedy for complaints about the administrative investigative process is to bring a de novo action in federal court.  See Trout, 1983 WL 578 at *1.  Plaintiff's citation to Forman v. Small, 271 F.3d 285 (D.C. Cir. 2001), does not save this claim.  Forman dealt with a failure to promote and had nothing to do with a claim alleging interference with an EEOC investigation.

        2.    Causation

    For plaintiff's remaining discrete claims of retaliation, he has established that he suffered an adverse employment action.  Three of these claims deal with plaintiff's performance reviews for fiscal years 1999 to 2001, and plaintiff's allegation that he did not receive the regular salary increase or that he received an insufficient bonus following those reviews.  On these claims, plaintiff's allegations regarding a reduction in salary is clearly an adverse action.   Plaintiff also has three non-promotion claims, each of which allege that plaintiff was denied some type of a promotion that would have allegedly increased his salary.

    The remaining element of plaintiff's prima facie case is whether there is a causal connection between plaintiff's protected activity and these adverse actions.  See Brody, 199 F.3d at 452.  Plaintiff brought EEOC complaints against defendant in 1999 and 2000, and filed his Complaint in this case in 2001.  Furthermore, in 1999 plaintiff successfully concluded litigation against defendant for previous retaliatory conduct against him.  The alleged retaliatory actions occurred over the same time period as plaintiff's administrative actions.  Plaintiff also alleges his protected activity was well known to his supervisors -- indeed, his

supervisor in 1999, Mr. Banscher, told him that he was "sick" of plaintiff's "lawsuit bullsh--."
Pl. Statement ¶ 61d.  Plaintiff has also offered other evidence that shows his prior litigation
was discussed among his supervisors.  See Pl. Statement ¶¶ 173d-175d.  Thus, not only were
plaintiff's supervisors aware of his protected activity, but plaintiff's remaining claims of
adverse action all occurred in close temporal proximity to at least one of his protected
activities.  See Clark Cty. School Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (close
temporal proximity between protected activity and adverse action can establish causation).
Plaintiff  therefore can establish a sufficient causal connection between his protected activity
and the adverse actions to make a prima facie case.

**B.    Non-Retaliatory Justifications and Pretext**

Because plaintiff has established a prima facie case on six of his claims, the burden
shifts to defendant to articulate a legitimate, non-retaliatory reason for the challenged
performance reviews and non-promotions.  See McDonnell Douglas, 411 U.S. at 802.  If
defendant satisfies that burden, then the burden shifts back to plaintiff to put forth evidence
that shows the proffered justification is a pretext for retaliation.  Id.

**1.    Performance Reviews**

Three of plaintiff's remaining claims arise from his performance reviews (or lack thereof)
for the fiscal years 1999 to 2001.  Plaintiff alleges that following each review (or the absence of a
review in 2000) he was denied either a merit salary increase or a sufficiently high bonus.  In
1999, following a delayed performance review, plaintiff was rated "highly successful," which
according to plaintiff should have meant he would get a merit salary increase.  Defendant
contends that even though plaintiff received a positive rating he was not guaranteed a merit salary

increase.  See Def. Mem. at 18.  Furthermore, plaintiff's immediate supervisor at that time,

Joesph Carper, believed there was a salary freeze so he did not give salary increases to any of his

subordinates.  Id. at 20-21.

Although plaintiff concedes that merit salary increases are discretionary, he argues

(without providing any evidence) that it is established policy to grant increases after a "highly

successful" review.  See Pl. Opp'n at 22.  Plaintiff also calls defendant's justification about a

salary freeze a "lie."  Id.  at 23.  According to plaintiff, five SBV employees, including two in the

same organizational line as plaintiff, were given raises in 2000.  See Pl. Statement ¶19d.

However, defendant is quick to point out that none of the employees cited by plaintiff were

supervised by Mr. Carper.  See Def. Mem., Ex. 20.  Furthermore, for three of them -- Mr.

Schelin, Ms. King, and Frank DiGiovine -- the only salary increase they received was a cost of

living adjustment of 4.9%.  See Def. Mem., Ex. 48, Supplemental Affidavit of Paul Wessel

("Supp. Wessel Aff.") ¶ 6.  This is the same cost of living adjustment that plaintiff received in

2000.  Id.  Defendant also contends that the other two salary increases cited by plaintiff were for

an employee not in museum shops and one who was given an increase as part of a promotion.  Id.

¶¶ 7-8.  On this record, plaintiff has fallen well short of establishing that defendant's proffered

explanation was pretextual.  Moreover, it is a bit troubling that plaintiff would attempt to pass off

cost of living adjustments received by some of his co-workers, which he also received, as the

merit salary increases he seeks.

In response to plaintiff's claim that he did not receive a performance review in 2000 and

as a result did not receive a merit salary increase, defendant contends that plaintiff's supervisor,

Mr. Wessel, was new to SBV and therefore did not have time to complete performance reviews

for any of his subordinates.  See Def. Mem. at 22.  Plaintiff attempts to show pretext by asserting

that four of the six subordinates of Mr. Wessel were "AE" employees and thus did not require a

performance review.  Pl. Opp'n at 24.  But plaintiff does not provide any evidence to support his

assertion that performance reviews were not needed for certain employees.  Defendant points out

that for fiscal year 2001 Mr. Wessel provided performance reviews for all his subordinates,

including those with "AE" status.  See Def. Mem. Ex. 49, Deposition of Paul Wessel ("Wessel

Dep.") at 56-58.  Thus, again, plaintiff has not offered any evidence to show that defendant's

proffered justification is a pretext for retaliation.

Plaintiff's final claim regarding his performance reviews is that in fiscal year 2001, he

was only rated "fully successful" and thus lost out on an additional one-time bonus that was tied

to the rating.  After fiscal year 2001, employees at SBV were entitled to a one-time bonus that

was directly tied to the performance rating received by the employee, i.e., a rating of "highly

successful" garnered a bonus of 4.5% of the employees salary while a "fully successful" rating

was worth a bonus of 3.5% of salary.  See Pl. Statement ¶ 243d.  Although plaintiff received

some fiscal year 2001 bonus, receipt of a less than expected bonus can constitute an adverse

employment action.  See Russell, 257 F.3d at 819.

Defendant contends that plaintiff's supervisor in 2002, Mr. Mercer, had several non-

retaliatory reasons for giving the plaintiff a "fully successful" rating.  Mr. Mercer determined that

plaintiff merely "met" but did not exceed all seven elements of his performance plan.  See Def.

Mem. at 25.  To get a "highly successful" rating, plaintiff needed to "exceed" the performance

standards for at least half of the seven elements of his performance plan.  Id. at 25 n.11.  On

some of the particular elements, Mr. Mercer noted that plaintiff had problems "dealing with

employee issues."  See Def. Mem., Ex. 69, Fiscal Year 2001 Performance Appraisal Form.  Mr.

Mercer also testified that he had received several complaints about plaintiff from store operations

and merchandising functions.  See Def. Mem., Ex. 88 Deposition of Gary Mercer ("Mercer

Dep.") at 100.  On plaintiff's review, Mr. Mercer also stated that "[plaintiff] needs to become

more involved in looking for opportunities for improvement in operating results."  See Def.

Mem., Ex. 69.  Defendant finally notes that Mr. Mercer gave "fully successful" ratings to four of

his six subordinates.  Def. Mem. at 26.

Plaintiff takes issue with Mr. Mercer's review.  He notes that Mr. Mercer's justification

for his rating lacked specificity, and in fact plaintiff contends that Mr. Mercer called plaintiff

"outstanding" in the area of inventory safeguards, one of the seven elements.  See Pl. Opp'n at 27.

Plaintiff also observes that an independent auditor review of the SBV inventory controls

approved the processes put in place by plaintiff.  Id.  Finally, he contends that he received

positive comments from Mr. Mercer's predecessor in 2000 for his ability to work with his

subordinates.  Pl. Statement ¶ 248d.

In evaluating whether plaintiff has established that defendant's justification was a pretext

for discrimination, the Court may consider all relevant evidence, including the strength of the

prima facie case and any properly-considered evidence supporting the employer's case.  Reeves,

530 U.S. at 147-48.  Plaintiff's prima facie case for this claim is not particularly strong.  He

received a bonus, just not as large a bonus as he would have liked.  Although a less than expected

bonus may be an adverse action, there is not much (albeit enough) evidence establishing a causal

connection between plaintiff's prior protected activity and the reduced bonus.  Not only did three

other subordinates of Mr. Mercer receive "fully successful" ratings and hence similar bonuses,

but Mr. Mercer joined SBV in January of 2001, after plaintiff filed his final administrative action

in this case.  See Def. Statement  ¶ 72.  Plaintiff's other evidence of a pretext for retaliation is

similarly weak.  Plaintiff's statement that Mr. Mercer called him "outstanding" in the area of

inventory safeguards does not fully represent the nature of the review.  In that same performance

element, Mr. Mercer notes that plaintiff "will gain a better understanding and will be able to offer

recommendations for improvement by attending store physical inventories."  Def. Mem., Ex. 69.

Moreover, a positive comment in one of the seven performance elements does not establish that

plaintiff should have met the criteria for "highly successful" -- an overall rating that requires

"exceeds" for at least half of the performance elements.  For fiscal year 2001, plaintiff was rated

"met" for all seven elements, thus his quibbles with one of the seven still leaves him well short of

meeting the requirement for a "highly successful" rating.  The lack of any other evidence to cast

doubt on defendant's non-retaliatory explanation for plaintiff's rating means defendant is entitled

to summary judgment on this claim.

### 2.   Non-Promotion

Plaintiff's non-promotion claims are that he was offered and then denied the position of

financial analyst, denied a promotion to administratively exempt ("AE") status, and not

promoted to the position of "corporate controller."  Taking each claim in turn, plaintiff cannot

show that the defendant's proffered justifications are a prextext for retaliation.  First, plaintiff

alleges that, in October 1999, Mr. Banscher, a second level supervisor of plaintiff, told him that

his position would be abolished, but that plaintiff could work in a new "financial analyst"

position being created.  See Second Am. Compl. ¶¶ 38-39.  However, plaintiff claims the new

position was withdrawn when Mr. Banscher learned of plaintiff's EEOC complaint.  Id. ¶ 40.

Defendant asserts that plaintiff was not promoted to a financial analyst position because such a position was never created or open for applications.  See Def. Mem. at 56-57 & Ex. 108, Banscher Dep. at 58.  Defendant also notes that there is no evidence plaintiff was ever informally or formally offered the position, and at best, plaintiff was merely shown a proposed reorganization chart that was never implemented.  Def. Mem. at 57.

In response, plaintiff insists the "offer" for this position was retracted when he filed his November 1999 EEOC complaint.  See Pl. Opp'n at 19.  However, beyond plaintiff's own speculation, there is no evidence of this quid pro quo.  There is also no evidence that the financial analyst position was ever offered to plaintiff, or that the position was ever actually created and filled.  Thus, plaintiff cannot show that defendant's reason for not promoting him -- the position itself was never created -- was a pretext for retaliation.  See Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir. 2002) (noting "'the two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought.'") (quoting Int'l Brotherhood of Teamsters v. United States, 431 U.S. 324, 358 n. 44 (1977)).

Plaintiff next claims that he should have been designated an "AE" employee, a status that he believes would have constituted a promotion.  Defendant, however, contends that not only is "AE" status not a promotion, but plaintiff did not qualify for such a designation because he was not hired, promoted, or reassigned during the relevant period.  See Def. Mem. at 32-34. Plaintiff's attempt to rebut defendant's justification focuses on whether "AE" designation is in fact a promotion.  See Pl. Opp'n at 20-21.  However, putting aside the question of whether "AE" status itself is a promotion, plaintiff has no response to defendant's explanation that he did not

qualify for "AE" status.  Plaintiff concedes that employees were designated "AE" only if they

were recently hired, promoted, or reassigned, see Pl. Statement ¶ 27, but argues that changes in

his position description amounted to a de facto promotion warranting "AE" designation, see Pl.

Opp'n at 21.  Plaintiff's evidence, however, is merely his own speculation flowing from changes

in his position description.  See id., Exs. 19-21.  But during all relevant times in this action,

plaintiff held the position Financial Manager of Museum Stores.  See Def. Statement ¶ 60.

Moreover, there is no evidence in the record that plaintiff was actually promoted or reassigned to

a different position so that he would have qualified for a designation to "AE."   Thus, plaintiff's

unsubstantiated and self-serving statement that he was effectively promoted or reassigned is not

sufficient to create a genuine issue of material fact.  See, e.g., Harding v. Gray, 9 F.3d 150, 154

(D.C. Cir.1993) ("mere unsubstantiated allegation ... creates no 'genuine issue of fact' and will

not withstand summary judgment"); Bryant v. Brownlee, 265 F. Supp. 2d 52, 68 (D.D.C. 2003)

(conclusory allegations in affidavit opposing summary judgment do not raise genuine issue of

material fact).

      Plaintiff's final non-promotion claim is that he was wrongfully denied a promotion to the

position of  "SBV corporate controller."  In the fall of 1999, plaintiff was informed by Mr.

Banscher that a "corporate controller" position was going to be created.  See Pl. Opp'n, Ex. V,

Oct. 17, 2003 Deposition of Shawn Kelley at 14.  Plaintiff also indicated at that time that, were a

"corporate controller" position ever created, he would like to apply for it.  Id. at 22.

Subsequently, in June 2000, Rob Schelin was promoted to the position of Special Projects

Deputy Financial Officer through a non-competitive hiring process.  See Wessel Aff. ¶ 18.

According to plaintiff, this was the same "corporate controller" position for which he had earlier

indicated an interest.  Defendant, however, contends that Mr. Schelin was hired to the position through a non-competitive process, and thus there was no requirement that applications be accepted for the position.  Def. Mem. at 34.  Defendant also notes that Mr. Schelin had developed experience working in a series of "transition" positions across a variety of SBV businesses.  Id. at 35-36.  Plaintiff, on the other hand, only had experience in the SBV museum stores division.  Id. at 36.

Plaintiff's claim of pretext is essentially that he was more qualified for the position than was Mr. Schelin.  Plaintiff bases this assessment on a review of his qualifications, noting that he possessed a college degree while Mr. Schelin did not.  See Pl. Opp'n at 14-15.  Plaintiff also notes that Mr. Schelin testified that plaintiff was more qualified than he was.  See Pl. Opp'n at 14.  But plaintiff misstates Mr. Schelin's testimony.  Mr. Schelin testified that although plaintiff had greater technical accounting experience, he had more experience than plaintiff.  See Schelin Dep. at 72, 82.  More importantly, only where a reasonable employer would have found plaintiff "significantly better qualified" can a fact finder infer that the employer consciously selected the less qualified applicant.  Carter v. George Washington Univ., 387 F.3d 872, 881 (D.C. Cir. 2004) (quoting Aka, 156 F.3d at 1294); see also Walker v. Dalton, 94 F. Supp. 2d 8, 16 (D.D.C. 2000) ("slight questions of comparative qualifications do not warrant a jury trial").  In order for disparities in qualifications to be evidence of pretext that would lead this Court to second-guess defendant's hiring decision, they must be "so apparent as to virtually jump off the page and slap us in the face.'"  Choates v. Powell, 265 F. Supp.2d 81, 95 (D.D.C. 2003); see also Bickerstaff v. Nordstrom, Inc., 48 F. Supp. 2d 790, 801 (N.D.Ill. 1999) (being in defendant's employ for longer than selectee does not by itself qualify plaintiff for the position in question, particularly where

selectee had different and potentially more relevant experience).  A review of the record shows

that plaintiff was not significantly more qualified than Mr. Schelin.  Moreover, plaintiff's

evidence of his superior qualifications is based solely on his own assessment, which is generally

not enough.  See Waterhouse v. District of Columbia, 124 F. Supp. 2d 1, 7 (D.D.C. 2000)

(pretext is not shown "simply based on [plaintiff's] own subjective assessment of [her] own

performance"), aff'd, 298 F.3d 989 (D.C. Cir. 2002).  Hence, plaintiff has not shown that

defendant's proffered justification is pretextual.[3]

## III.    Retaliatory Hostile Work Environment

Plaintiff's final claim is for what is best described as a retaliation-based hostile work

environment.  He reiterates the grounds for his discrete retaliation claims, as well as allegations

that his "problematic" posture at SBV was frequently discussed by his supervisors and he was

subjected to a barrage of personal insults by his supervisors and co-workers.  A workplace

environment becomes "hostile" for purposes of Title VII, of course, only when offensive conduct

"permeate[s] [the workplace] with discriminatory intimidation, ridicule, and insult that is

sufficiently severe or pervasive to alter the conditions of the victim's employment and create an

abusive working environment."  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81

(1998); accord Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993); see also Pa. State Police

v. Suders, 124 S.Ct. 2342, 2347 (2004); Clark Cty. School Dist., 532 U.S. at 270-271; Holbrook

v. Reno, 196 F.3d at 262.

The key terms, then, are "severe," "pervasive," and "abusive," as not just any offensive or

---

[3]  Mr. Schelin testified as a witness for plaintiff, and against defendant, in plaintiff's
earlier litigation.  That fact casts further doubt on plaintiff's claim that Mr. Schelin was promoted
in order to retaliate against plaintiff.

discriminatory conduct constitutes an actionable hostile work environment.  Under <u>Faragher v.</u>

<u>Boca Raton</u>, 524 U.S. 775, 787-88 (1998), in order to determine whether a work environment is

sufficiently hostile to be actionable under Title VII, a court should consider: (1) the frequency of

the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically

threatening or merely offensive; and (4) whether the conduct reasonably interferes with the

employee's performance.

> These standards for judging hostility are sufficiently demanding to ensure that
> Title VII does not become a "general civility code."  Properly applied, this will
> filter out complaints attacking "the ordinary tribulations of the workplace, such as
> the sporadic use of abusive language, gender-related jokes, and occasional
> teasing."

<u>Id.</u> at 787 (citations omitted).

Plaintiff has failed to establish his hostile work environment claim. Considering the

totality of the evidence proffered, and drawing all inferences in favor of plaintiff, there are no

genuine issues of material fact and no reasonable jury could find that plaintiff was subjected to an

actionable hostile work environment.  Simply put, plaintiff cannot meet the burden of showing

hostility in the work environment at SBV that was "severe," "pervasive," and "abusive."

The verbal insults directed at plaintiff by his supervisors were unrelated to plaintiff's

protected activity and, moreover, only occurred on a few occasions.  <u>See</u> Pl. Statement ¶ 182d

(work-related insults directed at plaintiff "two or three times").  The record also shows that there

were only a few alleged statements regarding plaintiff's prior litigation and subsequent

administrative complaints.  These comments fall well short of actionable harassment under a

hostile work environment assessment.  <u>See</u> <u>Faragher</u>, 524 U.S. at 788 (Title VII does not redress

"the ordinary tribulations of the workplace, such as sporadic use of abusive language").  The

remainder of plaintiff's alleged "hostile" events are the very employment actions he claims are retaliatory; he cannot so easily bootstrap alleged retaliatory incidents into a broader hostile work environment claim.  See <u>Lester v. Natsios</u>, 290 F. Supp. 2d at 33 ("Discrete acts constituting discrimination or retaliation claims . . . are different in kind from a hostile work environment claim that must be based on severe and pervasive discriminatory intimidation or insult."). Plaintiff's claim simply does not meet the threshold of severe, pervasive and abusive retaliatory conduct, and thus defendant is entitled to summary judgment on this claim as well.

## <u>CONCLUSION</u>

For the above reasons, defendant's motion for summary judgment is granted.  A separate order is issued on this date.

_____/s/ John D. Bates_____
JOHN D. BATES
United States District Judge

Dated:  August 30, 2005_____

Copies to:

**Randal M. Shaheen**
Arnold & Porter
555 12th Street, Northwest
Washington, D. C.  20004-1206
202-942-5734 (telephone)

**Craig L. Parshall**
910 Princess Anne Street
Fredericksburg, VA 22401-1206
540-371-5427 (telephone)
    *Counsel for Plaintiff*

**Oliver W. McDaniel**
**Michael C. Johnson**
Assistant United States Attorney
United States Attorney's Office for the
District of Columbia
555 Fourth Street, Northwest
Room 10-828
Washington, D. C.  20001
202-514-7220 (telephone)
    *Counsel for Defendant*